588 A.2d 760

**Patricia A. WATSON**

v.

**PEOPLES SECURITY LIFE INSURANCE COMPANY.**

**No. 23, Sept. Term, 1990.**

Court of Appeals of Maryland.

April 12, 1991.

468

Willie J. Mahone, Frederick, for petitioner.

Richard W. Douglas, Hagerstown, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE and CHASANOW, JJ.

RODOWSKY, Judge.

This is an abusive discharge case in which the jury found for the plaintiff. The Court of Special Appeals reversed, concluding, over a dissent (Bishop, J.), that the plaintiff had failed to prove the claim. *Peoples Security Life Ins. Co. v. Watson,* 81 Md.App. 420, 568 A.2d 835 (1990). The evidence most favorable to the plaintiff is that the discharge was in retaliation for the plaintiff's having sued a co-worker for a sexual harassment assault and battery, a joined claim on which the jury also found for the plaintiff. As explained below, an abusive discharge action lies.

Petitioner, Patricia A. Watson (Watson), was an at will employee of the respondent, Peoples Security Life Insurance Company (Peoples). Watson was a sales agent in Peoples' Hagerstown office. Another employee in that office was John Strausser (Strausser), the manager of a staff of agents other than the staff to which Watson was assigned.

The operative facts were set forth by the Court of Special Appeals.

"Soon after Strausser began his employment at the Hagerstown office in October or November of 1985, he suggested to [Watson] that he would like to have her on his staff. Becoming more insistent, he said things such as 'You're going to work for me whether you like it or not. I'm going to show you how to make real money.' Not only did Strausser continue this importuning during working hours, but also he began telephoning [Watson] at night at her home, saying such things as 'I want you to come in here. I have to sleep on the floor in the office. And doll face you can make a lot of money if you do this.'

"When [Watson] informed her sales manager, Michael Leidhecker (Leidhecker), about Strausser's advances, Leidhecker indicated that he would bring this matter to the attention of Harold Shoemaker (Shoemaker), the agency manager who was Strausser's direct supervisor. Relating the incidents to Shoemaker herself, [Watson] got

only a laughing response from Shoemaker who told [Watson] not to worry about it. Then, on the evening of January 29, 1986, [Watson] came into the office with Leidhecker. Strausser and one of his sales agents, Bill Bowman (Bowman), were already in the office. Approaching [Watson] from behind, Strausser placed his hands on her shoulders, and made a biting motion toward her chest, bringing his mouth within an inch of [Watson's] breast. Even though [Watson] protested, Strausser repeated this maneuver."

81 Md.App. at 424–25, 568 A.2d at 837.

Watson was at that time attired in a sweat shirt, advertising "Rocky's Pizza" on the front, and in a pair of slacks. She testified that "Mr. Strausser come up behind me and said something about he was going to take a bite of pizza and was trying to bite me in my chest." She further testified that Strausser "tried to take a bite of my breast."

"Leidhecker immediately brought the January 29 incident to the attention of Shoemaker. Shoemaker met with Strausser and told him 'to stay absolutely away from her [Watson] and do not speak unless you are spoken to.'

"In February 1986, [Watson] attended a training session at Hagerstown Junior College. Strausser attempted to grab [Watson] as she came out of the bathroom, asking 'Doll face what's the matter with you.' Besides attempting to grab [Watson] on that occasion, [Strausser] also verbally abused [Watson] at the training session on that day.

"Without any prior notice to Strausser or to any representative of [Peoples], the initial complaint in the instant case was filed in the Circuit Court [for Washington County] on March 13, 1986. [Peoples'] representatives were made aware of the fact that this action had been filed on March 17 or 18.

"On March 13, [Watson] requested permission from Leidhecker to be absent from work on March 14 so that she could keep a doctor's appointment. On the evening of March 14 or on March 15, [Watson] telephoned Leid-

hecker, and advised him that her physician had certified in writing that she would benefit from a two week medical leave of absence. Leidhecker approved that leave.

"Robert D. Williams (Williams), a vice-president of [Peoples] and field supervisor of the area encompassing Hagerstown, learned on March 17 or 18 of the suit filed by [Watson] on March 13. He advised Shoemaker by telephone that he would come to Hagerstown from his Annapolis office on Thursday, March 20, 'to investigate and to try to get a clearer picture of just what the problem was' in connection with the gravemen of the complaint filed by [Watson]. Also, Williams asked Shoemaker to have the parties involved and any witnesses to the incident of January 29, 1986 present, so he could interview them on March 20.

*Id.* at 425–26, 568 A.2d at 837–38.

Williams interviewed a number of Peoples' employees on March 20, but Watson was not present. Shoemaker, and then Williams, spoke to Watson by telephone. Watson was unwilling to meet with Williams without having her lawyer present. Williams was unwilling to talk with Watson's lawyer.

Every Friday morning all of the Hagerstown sales agents met in the Peoples' office there. At those meetings the agents turned in premiums which they had collected during the preceding week. Williams testified that he advised Watson in their telephone conversation that she would be "considered terminated" if she did not appear for the regular agency meeting on Friday, March 21, 1986. Watson did not appear at that meeting.

Peoples, by letter signed by Shoemaker and dated March 20, 1986, gave Watson notice of termination effective March 28. The assigned reasons were failure to appear at the March 14 "Agency meeting" and insubordination for failure to report for work on Thursday, March 20 when requested by Williams to do so. An internal form of Peoples by which

the agency manager reports to the home office on an employee's termination explains the reason for Watson's termination to be: "Unreported absence and insubordination . . . Williams discharged over phone for above reasons." Shoemaker testified that Williams had told Watson in the telephone conversation that she could " 'take this as a notification of [her] termination.' " Shoemaker also said that he had shown the termination letter, in rough draft form, to Williams on Thursday.

Williams testified that Shoemaker was to have written the letter of termination the following Monday if Watson did not attend the Friday, March 21 meeting. Williams denied telling Watson that she was terminated for not responding to his request to come to the office on March 20.

The suit which Watson filed on March 13 joined Strausser and Peoples as defendants. The complaint contained three counts. Count I claimed against both for the assault and battery of January 29. Count II claimed against both for intentional infliction of emotional distress. Each of counts I and II aver that Strausser was acting in the course of his employment. The third count claimed only against Peoples on the theory that it had negligently retained or supervised Strausser. Count III alleged that the "sexual attacks of January 29, 1986 were preceded by a series of annoying and sexually suggestive comments to [Watson] while on the premises of" Peoples, that Watson had informed her supervisors of the "on-the-job and away from the job harassment," but that Peoples had not intervened to abate the "offensive behavior" of Strausser.

After Watson was terminated by Peoples, she filed a first amended complaint. The amendment added certain new counts, of which only Count IV, claiming for abusive discharge, is relevant here. Watson alleged that her termination was motivated by the filing of the initial complaint in this action. She said that the termination violated her "right to petition the court, guaranteed by the First Amendment to the United States Constitution, 42 U.S.C. § 1981,

Article 19 ... and Article 40 of the Maryland Declaration of Rights."[1]

At trial Peoples moved for judgment under Maryland Rule 2–519(a) at the end of Watson's case. The motion was granted as to the assault and battery, intentional infliction of emotional distress, and negligent retention counts. The circuit court concluded that the workers' compensation statute immunized Peoples from tort liability to an employee for an assault by a co-employee. Because the emotional distress to which the plaintiff was subjected had not been shown to be sufficiently severe, in the trial court's judgment, motions on count II were granted in favor of Strausser, as well as Peoples. Count III fell because the court also determined that the plaintiff had failed to demonstrate that Peoples could have prevented the January 29 assault and battery.

Peoples' motion for judgment on the abusive discharge claim was denied. Watson argued that the true reason for the firing violated her right to petition the court as guaranteed by constitutional privileges alleged in the amended complaint. In this respect Watson relied upon *Leese v. Baltimore County*, 64 Md.App. 442, 468, 497 A.2d 159, 172, *cert. denied*, 305 Md. 106, 501 A.2d 845 (1985), where the court said, "We can conceive of no clearer 'mandate of public policy' than the rights spelled out in the United States Constitution." Peoples pointed out that *Leese* involved public employment and that the quoted language had no application to a private employer. Peoples further cited

---

1. Maryland Declaration of Rights, Art. 19 reads:
"That every man, for any injury done to him in his person or property, ought to have remedy by the course of the Law of the land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay, according to the Law of the land."
Article 40 reads:
"That the liberty of the press ought to be inviolably preserved; that every citizen of the State ought to be allowed to speak, write and publish his sentiments on all subjects, being responsible for the abuse of that privilege."

certain decisions from other jurisdictions holding that the employer had not committed abusive discharge by terminating an at will employee who was suing the employer.

At the close of the case the defendants renewed their motions for judgment to the remaining counts for the reasons argued at the end of the plaintiff's case. The circuit court denied those motions.

The case was submitted to the jury on special issues. They included:

"Did John Strausser commit an actionable assault or battery upon Patricia Watson?"

and

"Did Peoples Life Insurance Company wrongfully discharge Patricia Watson"

and

"If yes, was the discharge the result of ... retribution in contravention of a clear public policy?"

The court instructed the jury that abusive retaliatory discharge required termination of the employment relationship by the employer for a motive that "contravenes some clear mandate of public policy." The court further instructed:

"And it is the position of the plaintiff that her termination was motivated solely by her filing of a lawsuit against John Strausser and Peoples Life Insurance Company alleging assault and battery, intentional infliction of emotional harm and negligent supervision. You will note that neither of those last two counts are before you. But it is her position that she was discharged solely because of the filing of the law suit and therefore contravening a clear mandate of public policy by being punished for exercising her right of redress to the courts." [2]

---

**2.** Watson's requested instruction read:
"An employer has a right to fire an employee. However, the employer may not fire an employee where the motivation for the discharge contravenes public policy, such as a right of free speech,

Peoples excepted to the charge, arguing that "it is the function of the ... court to determine the public policy and that [discharge for] suing an employer is simply [as] a matter of law not a violation of a clear mandate of public policy." Peoples further explained its exception by stating that the court should "at least instruct the jury that ... suing an employer and the filing of any complaint, [ ]as that was what was done in this case, would not be sufficient to show a violation of a clear mandate of public policy...."

The jury returned a verdict against Strausser, finding "assault or battery," and awarded $300 compensatory damages. The jury found that Peoples had wrongfully discharged Watson and awarded $15,000 compensatory and $20,000 punitive damages.

Peoples appealed to the Court of Special Appeals.[3] There the employer argued, *inter alia*, error in the denial of its motion for judgment. Watson did not cross appeal.

"Viewing the evidence in a light most favorable to [Watson]," the Court of Special Appeals concluded that Peoples' "motivation for discharging [Watson] might have been based on a desire to sever its relationship with an employee who was actively pursuing litigation against it." 81 Md. App. at 429, 568 A.2d at 839. On that basis the court looked to decisions in other jurisdictions involving claims of abusive discharge against an employer whose motive was retaliation against an employee who was suing the employer over a salary dispute. Those cases held that there was no tort of abusive discharge, and the Court of Special Appeals held accordingly. In dissent Judge Bishop pointed out that "[t]he cases cited by the majority are distinguish-

---

which in this instance, is Plaintiff's right to bring a civil action against her co-employee and employer."

Peoples' requested instruction read:

"An employer has a right to fire an employee. However, the employer may not fire an employee because the employee is asserting constitutionally protected rights or for any other reason that violates a clear mandate of public policy."

**3.** Strausser satisfied the judgment against him.

able because they do not concern such an intensely personal affront to the employee as in the case *sub judice,* where the employee was sexually harassed to the point of an assault and battery." 81 Md.App. at 434, 568 A.2d at 842.[4]

We granted Watson's petition for certiorari.

## I

This Court has recognized "a cause of action for abusive discharge by an employer of an at will employee when the motivation for the discharge contravenes some clear mandate of public policy[.]" *Adler v. American Standard Corp.,* 291 Md. 31, 47, 432 A.2d 464, 473 (1981). In holding that the tort could lie on behalf of a worker who had a remedy for a wrongful discharge under a collective bargaining agreement, we said that "the public policy component of the tort is significant, and recognition of the availability of this cause of action to all employees, at will and contractual, will foster the State's interest in deterring particularly reprehensible conduct." *Ewing v. Koppers Co.,* 312 Md. 45, 49, 537 A.2d 1173, 1175 (1988). Here, Watson's first amended complaint, the instructions to the jury, and the way the case was tried and argued in the circuit court make plain that the jury found that the motive for the discharge arose out of Watson's filing of the initial complaint in this action. Under the instructions the jury could have found that discharge for filing any kind of suit was abusive. The jury also could have found that a discharge motivated by some one or more of the claims actually asserted by Watson was abusive. We shall consider whether there is liability under these various possibilities.

## II

The trial court's instruction adopted the theory that discharge in retaliation for an employee's exercising that em-

---

4. Peoples' brief in this Court advises that "[t]he issue [of sexual discrimination] was first raised by the panel at oral argument in the Court of Special Appeals." Respondent's brief at 22–23.

ployee's right of redress in the courts is abusive. We do not understand the trial court to have adopted the notion that constitutional rights of free speech and due process restricted the freedom of action of the private employer, Peoples.

■ To the extent that the instruction actually given permitted the jury to consider legal redress in the abstract as the relevant public policy, the instruction was erroneous. *Adler* held that allegations of discharge in retaliation for refusing to conceal " 'commercial bribery' " and " 'falsification of corporate documents' " were too general to state a cause of action. 291 Md. at 46, 432 A.2d at 472. The same deficiency infects an abstract "right of redress." The particular claim asserted which motivates the retaliatory discharge must be considered. *See, e.g., Ewing v. Koppers,* 312 Md. 45, 537 A.2d 1173 (workers' compensation claim).

But we need not decide whether Peoples' requested instruction waived the error (see n. 2, *supra*), or whether Peoples otherwise has failed to preserve the point. That is because there is reversible error by the trial court on the ground described below.

### III

The jury's verdict, finding abusive discharge, could also have been based upon a finding that Peoples' termination of Watson's employment was motivated exclusively by Watson's claim of: (1) assault and battery against Strausser, or (2) assault and battery against Peoples, or (3) intentional infliction against Strausser, or (4) intentional infliction against Peoples, or (5) negligent supervision against Peoples, or (6) some combination of these claims. Peoples' motion for judgment focused on Watson's suit against her employer. In that respect Peoples requested that the court instruct the jury that a discharge motivated by the suit against Peoples under the facts of this case was not abusive.

■ We agree with Peoples' contention, made to the circuit court, that it is for the court to determine, on any state of facts generated by the evidence, whether the relevant public policy considerations constitute the "clear mandate" referred to in *Adler.* "As cases arise before this Court presenting various public policies as potential bases for invoking abusive discharge, this Court must perform a function much like that of determining whether to recognize a new tort." *Makovi v. Sherwin–Williams Co.,* 316 Md. 603, 623, 561 A.2d 179, 189 (1989). The trial court's task is similar to determining whether the absence of probable cause has been established to maintain a malicious prosecution claim. See *Palmer Ford, Inc. v. Wood,* 298 Md. 484, 471 A.2d 297 (1984).

If a discharge motivated by the claims made by Watson against Peoples implicated no "clear mandate of public policy," then it was error to deny Peoples' motion for judgment as to that aspect of the case. On the same assumption it was also error to deny Peoples' exception to the court's failure to exclude Watson's claims against Peoples from jury consideration of possible motivations for abusive discharge. On the same hypothesis, the error would be a reversible one because we are not able to determine whether the jury predicated its verdict against Peoples' upon a legally insufficient theory as to which the claim of error has been preserved.

## A

■ We agree with the view of the Court of Special Appeals in this case that, absent a statute expressing a clear mandate of public policy, there ordinarily is no violation of public policy by an employer's discharging an at will employee in retaliation for that employee's suing the employer. Where the at will employee's claim involves disputed compensation or other benefits the employer is not required either to retain a discontented employee or to risk an abusive discharge suit. Rather, the at will employee is required to forego suit or risk discharge. *See Kavanagh v.*

*KLM Royal Dutch Airlines,* 566 F.Supp. 242 (N.D.Ill.1983); *Meredith v. C.E. Walther, Inc.,* 422 So.2d 761 (Ala.1982); *Becket v. Welton Becket & Assocs.,* 39 Cal.App.3d 815, 114 Cal.Rptr. 531 (1974); *Alexander v. Kay Finlay Jewelers,* 208 N.J.Super. 503, 506 A.2d 379, *cert. denied,* 104 N.J. 466, 517 A.2d 449 (1986). The tort of abusive discharge also has been denied where the discharge was in retaliation for a personal injury suit involving a non-work related injury, see *Daniel v. Magma Copper Co.,* 127 Ariz. 320, 620 P.2d 699 (Ariz.App.1980) or involving the employees' minor child, see *DeMarco v. Publix Super Markets, Inc.,* 360 So.2d 134 (Fla.App.1978), *aff'd,* 384 So.2d 1253 (1980) (per curiam). *But see Smith v. Atlas Off–Shore Boat Serv., Inc.,* 653 F.2d 1057 (5th Cir.1981) (tort lies, for compensatory damages only, for retaliation against Jones Act suit).

There is no clear mandate of public policy which would make actionable Peoples' discharge of Watson if that discharge were motivated solely by Watson's initial claims against Peoples. Accordingly, Peoples is entitled, at a minimum, to a new trial.

### B

■ Watson did not plead, or argue that she had proved, that Peoples in fact authorized, condoned, encouraged, or ratified Strausser's sexual assault on Watson. Nevertheless, even if the evidence were sufficient to support a finding that Peoples was responsible for "hostile environment" sexual discrimination based on Strausser's conduct, and even if the jury were to find that Watson's claim of liability for negligent supervision amounted to "hostile environment" sexual discrimination, Peoples would not be liable for abusive discharge for retaliating against Watson's suit against Peoples.

The United States Supreme Court has held that "hostile environment" sex discrimination, *inter alia,* is actionable under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (1988). *See Meritor Sav. Bank, F.S.B. v.*

*Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Applying portions of the guidelines issued by the Equal Employment Opportunity Commission (EEOC) in interpreting Title VII, the Court noted that sexual harassment actionable under Title VII included " '[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature.' 29 C.F.R. § 1604.11(a) (1985)." *Id.* at 65, 106 S.Ct. at 2404. Hostile environment sexual harassment need not be "directly linked to the grant or denial of an economic *quid pro quo* where 'such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.' § 1604.11(a)(3)." *Id.* at 65, 106 S.Ct. at 2404–05. Inasmuch as Title VII prohibits retaliatory discharges for complaints about any violations of its prohibitions, *see* 42 U.S.C. § 2000e–3(a), Title VII would prohibit discharge in retaliation for a complaint of hostile environment sexual harassment.

The source of the policy against hostile environment sexual discrimination is statutory, and exclusively statutory. Those statutes provide the remedies for their violation. Thus the abusive discharge tort would not reach Peoples' retaliation even if Watson's suit against it is interpreted to be based on Peoples' permitting a "hostile environment" in which Strausser committed the assault. *See Chappell v. Southern Maryland Hosp., Inc.,* 320 Md. 483, 578 A.2d 766 (1990); *Makovi v. Sherwin–Williams Co.,* 316 Md. 603, 561 A.2d 179 (1989).

## IV

■■ Under the trial court's instructions it was also possible for the jury to have found that Peoples' discharge of Watson was motivated by Watson's suit against Strausser for assault and battery. We hold that it is contrary to a clear mandate of public policy to discharge an employee for seeking legal redress against a co-worker for workplace

sexual harassment culminating in assault and battery.[5] Thus, Peoples was not entitled to a motion for judgment entirely dismissing the plaintiff's claim.

## A

Although "declaration of public policy is normally the function of the legislative branch," *Adler*, 291 Md. at 45, 432 A.2d at 472, *Adler* also pointed out that this "Court has not confined itself to legislative enactments, prior judicial decisions or administrative regulations when determining the public policy of this State." *Id.* The clear mandate of public policy which Watson's discharge could be found to have violated was the individual's interest in preserving bodily integrity and personality, reinforced by the state's interest in preventing breaches of the peace, and reinforced by statutory policies intended to assure protection from workplace sexual harassment.

> "An assault is any unlawful attempt to cause a harmful or offensive contact with the person of another or to cause an apprehension of such a contact. A battery is its consummation. *See* Restatement (Second) of Torts §§ 13, 21 (1965); Prosser, *Law of Torts*, §§ 9, 10 (4th ed. 1971)."

*Continental Casualty Co. v. Mirabile*, 52 Md.App. 387, 398, 449 A.2d 1176, 1183, *cert. denied*, 294 Md. 652 (1982). In the case before us the evidence supports finding a battery as well as an assault because Strausser placed his hands on Watson's shoulders in both of his attempts to bite her on the breast. " 'Since the right protected is that of the person attacked, [any] secret intention of the wrongdoer not to perform the threatened act ... is not a legal excuse in a civil action.' " *Dixon v. State*, 302 Md. 447, 458, 488 A.2d

---

**5.** The jury verdict in favor of the plaintiff against Strausser demonstrates that the claim was meritorious. Indeed, Peoples did not deny that the assault and battery of January 29, 1986, had taken place. This case does not present the problem of an alleged abusive discharge motivated by the plaintiff's having asserted what the employer reasonably believed, at the time of the discharge, to have been a spurious claim against a co-employee.

962, 967 (1985) (quoting *Hayes v. State,* 211 Md. 111, 115, 126 A.2d 576, 578 (1956)).

The right to bring a civil action based on the apprehension of an offensive bodily contact has been traced in the common law to 1348 or 1349. *See* Carpenter, *Intentional Invasion of Interest of Personality,* 13 Or.L.Rev. 227, 237 n. 57 (1934). "The explanation ... of this early recognition of the right to be free from apprehension of violence is found in the fact that the excitement of such an apprehension was likely to result in breaches of the peace, and if the law gave a remedy it would thus tend to discourage them." *Id.* at 237.

We have also said that assault " 'has substantially (if not exactly) the same meaning in our law of torts as in our criminal law.' " *Dixon v. State,* 302 Md. at 458, 488 A.2d at 967 (quoting *Kellum v. State,* 223 Md. 80, 84–85, 162 A.2d 473, 476 (1960)). Watson's testimony supports an inference that Strausser's actual intent was to bite her on the breast. In a criminal proceeding, were the trier of fact persuaded beyond a reasonable doubt that Strausser did so intend for sexual gratification, he would be guilty of attempted fourth degree sex offense. *See* Md.Code (1957, 1987 Repl.Vol.), Art. 27, § 464C; *Gray v. State,* 43 Md.App. 238, 403 A.2d 853, *cert. denied,* 286 Md. 747 (1979).[6]

Watson also proved that the assault and battery were part of a pattern of sexual harassment by Strausser both at the workplace and elsewhere. We have seen, *supra,* Part III B, that hostile environment sexual discrimination violates Title VII. This Court has held that the Maryland Fair

---

**6.** Md.Code (1957, 1987 Repl.Vol., 1990 Cum.Supp.), Art. 27, § 464C in relevant part provides:

"(a) *What constitutes.*—A person is guilty of a sexual offense in the fourth degree if the person engages:

(1) In sexual contact with another person against the will and without the consent of the other person...."

Article 27, § 461(f) defines "sexual contact" to include

"the intentional touching of any part of the victim's or actor's anal or genital areas or other intimate parts for the purpose of sexual arousal or gratification or for abuse of either party...."

Employment Practices Law, Md.Code (1957, 1986 Repl.Vol.), Art. 49B, §§ 14–18 (the Act), not only prohibits retaliatory discharges for complaints about sexual harassment in the workplace, but also that those prohibitions apply even if the complainant is not the direct victim of that harassment. *See Chappell,* 320 Md. 483, 578 A.2d 766.

The public policy manifested in Title VII and in the Act prohibits, and provides statutory remedies against, retaliatory discharge for seeking legal redress for sexual harassment which need not amount to assault and battery. *A fortiori,* where, as here, a retaliatory discharge is in response to an employee's seeking legal redress against a co-worker because of sexual harassment which does amount to assault and battery, *Adler's* requirement of a clear mandate of public policy is satisfied.

## B

Peoples submits that Watson's "failure to raise unlawful sex discrimination as a 'clear mandate of public policy' at trial constitutes a waiver of such issues in an appeal." Respondent's Brief at 23. The *issue* in this case with respect to count IV has always included whether Peoples' discharge of Watson violated a clear mandate of public policy. In the trial court Watson *argued* general concepts of access to the courts and due process. Now, in this Court, Watson, inspired by the dissent in the Court of Special Appeals, also emphasizes the sexual harassment aspects of the assault.

This contention by Peoples is analogous to that which we rejected in *Crown Oil & Wax Co. v. Glen Constr. Co.,* 320 Md. 546, 578 A.2d 1184 (1990). There the issue was whether a partnership which had acquired the assets of a corporate real estate developer could arbitrate directly with a construction contractor who agreed to arbitrate with the corporation. Although the partnership had argued a third-party beneficiary theory in the trial court, we considered and accepted an argument that the corporation was the

successor-in-interest to the corporation. *Id.* at 560–61, 578 A.2d at 1190–91.

■ Further, Maryland Rule 8–131(a) provides that "[o]rdinarily, the appellate court will not decide any ... issue unless it plainly appears by the record to have been raised in or decided by the trial court...." Even if sexual harassment assault and battery were a new issue in this case, we exercise our discretion to consider it. There is no prejudice to Peoples. The sexual harassment aspects of this case have been patent from the beginning. In her initial complaint and in evidence at trial Watson relied on the pattern of sexual harassment in an effort to prove Peoples' negligent supervision.

### C

Peoples also contends that abusive discharge is not available here in light of *Makovi v. Sherwin–Williams Co.,* 316 Md. 603, 561 A.2d 179. Peoples says that *Makovi* "held that the existence of a remedy under Title VII [and the Act] barred an action for wrongful discharge [in a] case which relies upon allegations of unlawful sexual discrimination as the required 'clear mandate of public policy.'" Respondent's Brief at 21. Peoples' argument stretches the holding in *Makovi* beyond its context.

*Makovi* was a prenatal protection, alleged sex discrimination case. The substance of the analysis in *Makovi* can be found in this Court's presentation of the respondent employer's principal argument, with which we expressly agreed.

"The respondent's principal argument is that abusive discharge does not lie where the public policy sought to be vindicated by the tort is expressed in a statute which carries its own remedy for vindicating that public policy. Sherwin–Williams does not argue that the General Assembly in 1965 or 1977 intended to preclude a tort which did not then exist and does not argue that the General Assembly intended to preclude or preempt any and all remedies arising out of facts constituting a violation of

Art. 49B. In addition, Sherwin–Williams submits that the anti-discrimination goal of the allegedly applicable statutes and the remedy legislatively created to achieve that goal together make up the public policy. In the employer's view, Makovi seeks to divorce the statutory remedy from the goal and, in the name of achieving the goal, enlarge the remedy for a statutory violation to full compensatory and punitive damages in tort."

*Id.* at 609, 561 A.2d at 182.

Chief Judge Murphy, writing for the Court in *Chappell*, 320 Md. 483, 578 A.2d 766, said, speaking of *Makovi*, that "[w]e held that the tort of abusive discharge will not lie where the public policy sought to be vindicated by the tort is expressed in a statute which carries its own remedy for vindicating that public policy." *Id.* at 490, 578 A.2d at 770.

Thus, in both *Makovi* and in *Chappell*, the public policy component of the abusive discharge tort was found in Title VII and in the Act, but not elsewhere. In that context,

"the generally accepted reason for recognizing the tort, that of vindicating an otherwise civilly unremedied public policy violation, does not apply. Further, allowing full tort damages to be claimed in the name of vindicating the statutory public policy goals upsets the balance between right and remedy struck by the Legislature in establishing the very policy relied upon."

*Makovi*, 316 Md. at 626, 561 A.2d at 190.

*Makovi* did not rest its holding "on any legislative preemption but on the nature of the tort." *Id.* at 605, 561 A.2d at 180. Essentially Peoples seeks a preemption result. But the fact that the assault and battery in the instant case arise out of sexual harassment in the workplace does not end the inquiry. Long antedating Title VII and the Act, public policy, as manifested in civil and criminal law, provided sanctions against attempted and consummated harmful and offensive touching of the person, whether or not sexually motivated. Had Title VII or the Act never been enacted, a clear mandate of public policy still supported Watson's

recourse to legal redress against Strausser under the circumstances here. Where right and remedy are part of the same statute which is the sole source of the public policy opposing the discharge, *Makovi* and *Chappell* dictate the result that the tort of abusive discharge, by its nature, does not lie. In the instant matter there are multiple sources of public policy, some within and some without Title VII and the Act. By including prior public policy against sexual assaults, the anti-discrimination statutes reinforce that policy; they do not supersede it.

*Makovi* foreshadowed this approach to multiple source public policy by favorable reference to a decision sustaining the tort where the discharge was in retaliation for resisting *quid pro quo* sexual harassment.

"Sometimes the facts underlying a discharge constitute both a violation of an anti-discrimination statute and of another, more narrowly focused, statute reflecting clear public policy but providing no civil remedy [for the discharge]. *Lucas v. Brown & Root, Inc.*, 736 F.2d 1202 (8th Cir.1984) illustrates an analysis which utilizes the narrower ground. There the plaintiff alleged that she had been fired because she refused to sleep with her foreman. The court reasoned that '[a] woman invited to trade herself for a job is in effect being asked to become a prostitute.' *Id.* at 1205. Prostitution was a crime denounced by Arkansas statute. The Eighth Circuit predicted the Supreme Court of Arkansas would find an abusive discharge because the plaintiff 'should not be penalized for refusing to do what the law forbids.' *Id.*"

316 Md. at 620, 561 A.2d at 187.

Similarly, the same clear public policy which encourages Watson's legal recourse against one who degradingly assaulted her makes tortious a discharge that retaliates against that recourse.

## V

In the Court of Special Appeals, Peoples presented additional questions which that court did not reach, in view of

its holding. It appears that Peoples would be entitled to a judgment of dismissal, without prejudice, if it is successful on one of those open questions.[7] Consequently, this case must be remanded to the Court of Special Appeals for consideration of at least that additional question. Even if Peoples does not prevail on remand in the Court of Special Appeals on any open question, it would be entitled to a new trial based on our holding in Part III A, *supra.*[8]

JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENT, PEOPLES SECURITY LIFE INSUR-ANCE COMPANY.

ELDRIDGE, Judge, concurring in part and dissenting in part.

Although I concur with parts II and IV of the majority's opinion, I disagree with Part III. The majority holds that, while it would contravene public policy for Peoples to dis-charge Ms. Watson for filing a lawsuit against Mr. Straus-ser alleging sexual harassment, it would not violate public policy for Peoples to discharge Ms. Watson for filing a lawsuit against Peoples based on identical allegations. Be-cause I believe the majority's reasoning and conclusion to be fundamentally flawed, I dissent.

## I.

As established in *Adler v. American Standard Corp.*, 291 Md. 31, 47, 432 A.2d 464, 473 (1981), and reiterated

---

**7.** The question is: "Did the trial court err in denying [Peoples'] motion for judgment on the ground that [Watson] failed to exhaust her available contractual remedies?"

**8.** Peoples, as part of its brief in this Court, has moved to dismiss Watson's petition for certiorari because of claimed violations of the rules relating to appellate procedure. The motion is denied.

today by the majority, "Maryland does recognize a cause of action for abusive discharge by an employer of an at will employee when the motivation for the discharge contravenes some clear mandate of public policy." *Adler* made clear that, "when determining the public policy of this State," this Court "has not confined itself to legislative enactments, prior judicial decisions or administrative regulations." 291 Md. at 45, 432 A.2d at 472. The majority today, however, seems to hold that, absent a *statute* clearly establishing a mandate of public policy, an employer may fire an employee for suing the employer, regardless of the basis of the complaint. In deciding that there is "no clear mandate of public policy which would make actionable Peoples' discharge of Watson if that discharge were motivated solely by Watson's initial claims against Peoples," the majority misapprehends the facts of the case and disregards the principles of law enunciated in *Adler*, in *Makovi v. Sherwin-Williams Co.*, 316 Md. 603, 561 A.2d 179 (1989), and elsewhere in the majority opinion in the present case.

As stated by Judge Bishop, dissenting from the decision of the Court of Special Appeals in this case,

"[w]hile the institution of a suit against an employer alone may not be enough to contravene public policy, this Court should not ignore the nature of the suit and the employer's conduct which may provoke it. The grounds for the suit itself may be in contravention of public policy.... [T]he abusive discharge count, includes by reference all of the allegations included in the previous ... counts. These counts clearly contain the sexual harassment claims and the facts contained in them...." *Peoples Security Life v. Watson*, 81 Md.App. 420, 433–434, 568 A.2d 835, 841–842 (1990).

The majority ignores the underlying allegations of sexual harassment by Mr. Strausser as well as allegations and evidence presented at trial that Peoples ratified Mr. Strausser's conduct. The record supports a finding that Peoples knew of Mr. Strausser's actions but failed to take prompt or adequate remedial action. *See Monge v. Beebe Rubber Co.,*

114 N.H. 130, 132–134, 316 A.2d 549, 551–552 (1974) (plaintiff wrongfully discharged where she was terminated, in part, for refusing foreman's advances and manager of company "knew her foreman used his position to force his attentions on the female employees"). *See also College–Town v. Mass. Com'n Against Discrim.*, 400 Mass. 156, 163–167, 508 N.E.2d 587, 591–593 (1987) (plaintiff wrongfully discharged when employer fired her after she filed EEOC complaint alleging sexual harassment where employer knew of sexual harassment and did nothing to abate it).

The record shows that before the assault and battery on Ms. Watson, she spoke with Mr. Leidhecker, her supervisor, about Mr. Strausser's bothering her by calling her at home at night and asking her to come to the office to see him. Mr. Leidhecker said that he would talk to Mr. Strausser and to Mr. Shoemaker, the Agency Manager who had supervisory control over Mr. Strausser. Mr. Leidhecker also suggested that Ms. Watson speak directly with Mr. Shoemaker. Ms. Watson testified at trial that when she told Mr. Shoemaker about the harassing phone calls, he "kind of laughed at me and told me not to worry about it." In fact there is no indication from the record that anyone in management at Peoples, before or after the assault and battery, took any meaningful steps to stop Mr. Strausser's harassment of Ms. Watson. Nevertheless, shortly after Ms. Watson filed suit against Mr. Strausser and Peoples because of the sexual harassment, she was fired.[1] According to the majority's opinion, it was consistent with public policy for Peoples to fire Ms. Watson for filing a complaint containing allega-

---

1. The record reflects that Ms. Watson also filed a complaint against John Strausser and Peoples with the Equal Employment Opportunity Commission. The EEOC conducted an investigation and found no probable cause to believe that Peoples had engaged in unlawful sexual discrimination and advised her of her right to file an action under Title VII. At the time, Ms. Watson may have elected not to proceed under Title VII because it may have been assumed that federal courts had exclusive jurisdiction over Title VII claims. It has become settled since Ms. Watson's trial that Maryland courts have concurrent jurisdiction over Title VII claims. *Sweeney v. Hartz Mountain Corp.*, 319 Md. 440, 443, 573 A.2d 32, 33 (1990).

tions of sexual harassment on the job even though it was aware of the harassment and did nothing to stop it.

The majority states in Part IV of its opinion, citing *Makovi v. Sherwin–Williams Co., supra,* 316 Md. 603, 561 A.2d 179, that there may be "multiple sources of public policy, some within and some without Title VII and the [Maryland Fair Employment Practices Law, Code (1957, 1991 Repl.Vol.), Art. 49B, §§ 14–18]." But, when discussing Peoples' discharge of Ms. Watson for filing suit against it based on the same facts alleged in her complaint against Mr. Strausser, the majority ignores any alternate sources of public policy. Contrary to the majority's myopic view, whether the public policy is found in the Maryland Constitution, in other statutes, in the common law, or in the actions of Maryland governmental entities, "[i]t cannot seriously be doubted that this State has an undeclared yet clearly mandated public policy" proscribing workplace sexual harassment. *Peoples Security Life v. Watson, supra,* 81 Md.App. at 434, 568 A.2d at 842 (Bishop, J., dissenting).

Article 46 of The Maryland Declaration of Rights provides that "[e]quality of rights under the law shall not be abridged or denied because of sex." Although this constitutional provision may not directly apply to private employers, it nonetheless establishes a public policy in Maryland that an individual should not be subjected to sex-based discrimination. *See James v. Marinship Corp.,* 25 Cal.2d 721, 739–740, 155 P.2d 329, 339 (1944). It is well settled that workplace sexual harassment is a form of sex-based employment discrimination. *See, e.g., Meritor Savings Bank v. Vinson,* 477 U.S. 57, 66–67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49, 59 (1986); *Katz v. Dole,* 709 F.2d 251, 254–255 (4th Cir.1983); *Holien v. Sears, Roebuck and Co.,* 298 Or. 76, 87, 689 P.2d 1292, 1298 (1984). Therefore, if Peoples fired Ms. Watson for filing a complaint against it alleging ratification of sexual harassment on the job, it contravened a clear public policy mandated by the Maryland Constitution. *See, e.g., Rojo v. Kliger,* 52 Cal.3d 65, 276 Cal.Rptr. 130, 145–146, 801 P.2d 373, 388–389 (1990).

As noted by the majority today, this Court stated in *Makovi v. Sherwin–Williams Co., supra,* 316 Md. at 620, 561 A.2d at 187, that "the facts underlying a discharge [may] constitute both a violation of an anti-discrimination statute and of another, more narrowly focused, statute reflecting clear public policy but providing no civil remedy. *Lucas v. Brown & Root, Inc.,* 736 F.2d 1202 (8th Cir.1984), illustrates an analysis which utilizes the narrower ground. There the plaintiff alleged that she had been fired because she refused to sleep with her foreman. The court reasoned that '[a] woman invited to trade herself for a job is in effect being asked to become a prostitute.' " *See also, Harrison v. Edison Brothers Apparel Stores, Inc.,* 924 F.2d 530 (4th Cir.1991). Given the facts of the present case, I fail to see why this Court could not find that Peoples' discharge of Ms. Watson violated a clear mandate of public policy as set forth in Maryland's statute prohibiting pandering.[2] The record reflects that Mr. Strausser, although he did not directly supervise Ms. Watson, held a higher position at Peoples than Ms. Watson. In addition, the record shows that, aside from making inappropriate comments to the plaintiff at work, he called her at home in the evenings imploring, "I want you to come in here. I have to sleep on the floor in the office. And doll face, you can make a lot of money if you do this." Furthermore, the plaintiff testified that Mr. Strausser threatened that if she did not come into the office with him at night he would use his position to "hurt [her] financially."

Even absent constitutional or statutory provisions, I believe that Peoples violated a clear mandate of public policy if it fired Ms. Watson in retaliation for her lawsuit against Peoples. *See* Maryland Special Joint Committee, *Gender Bias in the Courts,* at 80–83, 93–96 (1989) (the report generated by the committee appointed by Chief Judge Murphy condemns sexual harassment in the workplace); *Chamberlin v. 101 Realty, Inc.,* 626 F.Supp. 865, 867 (D.N.H.

---

**2.** Maryland Code (1957, 1987 Repl.Vol.), Art. 27, § 426.

1985), *citing Monge v. Beebe Rubber Co., supra,* 114 N.H. 130, 316 A.2d 549 (recognizing that under New Hampshire law workplace sexual harassment is against public policy). *See also Smith v. Atlas Off-Shore Boat Service, Inc.,* 653 F.2d 1057, 1062 (5th Cir.1981) (court finds cause of action for wrongful discharge where seaman alleged discharge in retaliation for filing personal injury suit under the Jones Act, stating "[t]he employer should not be permitted to use his absolute discharge right to retaliate against a seaman for seeking to recover what is due him or to intimidate the seaman from seeking legal redress. The right to discharge at will should not be allowed to bar the courthouse door").

Finally, the cases relied on by the majority for the proposition that, "absent a statute expressing a clear mandate of public policy, there ordinarily is no violation of public policy by an employer's discharging an at will employee in retaliation for that employee's suing the employer," are distinguishable from the present case. First, it is apparent from the cases cited by the majority from Alabama and Florida that those courts did not recognize the cause of action for abusive discharge. Second, other cases cited involve such issues as salary disputes; none involve "such an intensely personal affront to the employee as in the case *sub judice,* where the employee was sexually harassed to the point of an assault and battery". *Watson v. Peoples,* 81 Md.App. at 434, 568 A.2d at 842 (Bishop, J., dissenting). *See also Carlson v. Crater Lake Lumber Co.,* 103 Or.App. 190, 194, 796 P.2d 1216, 1219 (1990).

## II.

The majority in Part III B of its opinion reiterates the holding set forth in *Makovi v. Sherwin Williams, supra,* 316 Md. 603, 561 A.2d 179, and *Chappell v. Southern Maryland Hosp.,* 320 Md. 483, 578 A.2d 766 (1990), that Title VII and the Maryland Fair Employment Practices Law, Code (1957, 1991 Repl.Vol.), Art. 49B, §§ 14–18, provide the exclusive remedies against the employer for sex discrimination in employment. With regard to this part of

the majority opinion, I continue to adhere to the dissents in both of those cases.